THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN ALBERT STOKES, JR., Defendant-Appellant.

First District (5th Division)   No. 78-862

Opinion filed August 24, 1979.

814

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Paul C. Gridelli, and Cary J. Wintroub, Assistant State's Attorneys, of counsel), for appellant.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) and sentenced to a term of 6 to 18 years imprisonment. On appeal, he contends that (1) the trial court denied

him his right to present a defense, (2) the prosecutor's closing argument denied him a fair trial, and (3) he was improperly sentenced.

The following pertinent evidence was adduced at trial.

*For the State*

*Josephine Lenardi*

On March 2, 1976, she worked as the cashier in a record store known as "Val's Halla," located at 723½ South Boulevard in Oak Park. The store is owned by Val Camilletti. The store is "well lit" by spotlights and fluorescent lights, including two spotlights over the cash register and counter. At approximately 6:30 p.m., a man whom she identified in court as the defendant entered the store. After looking at records for about 15 minutes, defendant brought a used record up to the counter and asked her if she would play it for him. She told him they did not play records for customers, and defendant returned it to the used record room. A few minutes later, defendant brought up a box of "Genie" incense, paid for it, and left the store. She next saw defendant exit from an orange "Karmann Ghia" automobile which was parked on the street in front of the store. He came up to the cash register and said, "Hi." He had a small black gun in his hand, and had nothing over his face. He said "give me money." When she gave him the "fives" and "tens," he told her to give him the "ones" too. She said, "don't shoot me," and gave him all of the one-dollar bills, including 25 bills which were wrapped in an orange paper band. Defendant then ran out of the store, got back into the orange Karmann Ghia, and drove east on South Boulevard. Val Camilletti and a customer then walked in, and Val called the police. She described the offender to Val and the police as a black male in his 20's, about six feet tall, wearing a brown jacket, brown hat, blue jeans and a short beard, and driving an orange Karmann Ghia. At 8:30 or 9 that night, she viewed a six-man lineup at the Oak Park Police Station, and identified defendant as the offender.

On cross-examination, she acknowledged that although defendant faced her directly across the two or three feet wide counter for a total of five to six minutes, she did not notice whether or not he had any scars on his face. She acknowledged that she did not count the money in the cash register, and did not know the amount that was there when she gave it to defendant.

*Val Camilletti*

She is the owner of "Val's Halla, Inc." a record store and the scene of the robbery. The store is lit by spotlights and fluorescent lights. On March 2, 1976, at about 6:30 p.m., she saw defendant, who apparently was a customer, in the store. She went to the rear of the store's used record room, and was using the phone to make some long distance calls. At

approximately 7 p.m. she heard Jo Lenardi, who was working as the cashier, say "Oh no, please don't shoot me." She told the person on the phone that she thought they were being robbed, and rushed to the front of the store. She saw an orange Karmann Ghia pulling away. Lenardi told her that the man in the car had just robbed her. She called the police and relayed Lenardi's description of the offender to them. She inventoried the cash register, and found that $162 was missing. She identified a brown and orange money wrapper as the type of wrapper they would use to wrap $25 worth of single dollar bills.

On cross-examination, she estimated that defendant was two or three feet away from her when she saw him in the store. She acknowledged that her store does not sell "Genie" incense now, and that she could not find any records indicating that she purchased that incense in 1975 or 1976.

*Bernard Buckholz, Oak Park Police Officer*

On March 2, 1978, he and his partner Jan Stachura were patrolmen working in plain clothes and an unmarked car. At approximately 7 p.m., pursuant to a radio call, they drove to Elmwood and Madison, which is approximately one-half mile southeast of the "Val's Halla" record store. They had been informed that the store had been robbed, and had received a description of the offender and his vehicle. After spotting an orange Karmann Ghia going east on Madison, they turned on their emergency lights and followed it. After about four blocks, the car stopped. Defendant was driving the car, and they ordered him to get out. Stachura frisked defendant, and found that he was wearing a shoulder holster. He also found a wad of money in defendant's pocket, and a loaded "Llama" .22-caliber pistol under the driver's seat. At the police station the money, which was in 10-, 5-, and 1-dollar bills, was found to total $162. Included in this was 25 one-dollar bills wrapped in a brown money wrapper with orange printing on it. They later found more ammunition for the gun under the driver's seat of the Karmann Ghia, and a box of "Genie" incense on the front passenger seat. A six-man lineup was held about one hour after defendant was arrested, and Jo Lenardi picked out defendant as the man who committed the robbery.

On cross-examination, he acknowledged that defendant was not violating any laws when first observed, and he did not attempt to flee. Defendant never complained that his large right toe was giving him an enormous amount of pain.

*Jan Stachura, Oak Park Police Officer*

He substantially corroborated Officer Buckholz's account of the search and arrest of defendant. Defendant exited his car after repeated commands. He wore blue jeans, a brown suede hat, and a brown jacket and shirt.

On cross-examination he conceded that when inventorying defendant's personal property at the police station, he found that defendant had an additional $13 in a wallet, and 60 cents in change.

*For the Defense*
*Defendant John Albert Stokes, Jr.*, on his own behalf.

He served six years in the Marines, and received a Purple Heart, the Viet Nam Service Ribbon, and the Good Conduct Ribbon. In the middle of his forehead he has a scar which he received 18 years ago as a child. In March of 1976, he worked as a machinist for International Harvester and lived at 5501 W. Washington in Chicago. He owned the "Llama" .22-caliber pistol which was previously testified to. The gun was black with a chrome ejection and green plastic handle. It was properly registered, and he purchased it after he was shot in front of his building. He kept it in his house, and when he left, he placed it on the passenger seat in his car. On February 26, 1976, he "ripped" his big toe in an accident at home. He saw a Dr. Yanong at the Madison Hines Medical Center. The doctor prescribed that he elevate his foot and soak it in "Phisohex." That same day he went to International Harvester to pick up his wages. He reported to Rita Goodman, a nurse, that he couldn't work because of his injury. He then went and cashed his check, which was for $193.94.

At approximately 6:30 p.m. on March 2, 1976, he left his home and drove in his 1972 Volkswagen Karmann Ghia to the "Bargain Store" to get a foot pan. He was wearing a suede jacket, a brown cap and brown slacks. He had $13 in his wallet, and approximately $160 in his right front pants pocket. He discovered that they did not have foot pans at the Bargain Store. He left and was driving down Madison towards his home when he was stopped by the police officers. He had a box of "Genie" incense in the car. It was in the glove compartment, where he put it the week before after purchasing it in Chinatown. He did not rob the record store that evening, did not go there, and didn't even know where it is.

On cross-examination he acknowledged that he was wearing a shoulder holster, and stated that he did so because his jacket had no pockets. He conceded that he didn't get a foot pan between February 26 and March 2, and explained that he soaked his foot in the bathtub and didn't go out of the house. He explained that he was carrying the $160 with him because his apartment building had been broken into, and he never left loose cash in the apartment. He conceded that he had a bank account, and that he did not put the $160 in his bank account. He did not recall the name of the store in Chinatown where he bought the "Genie" incense. He was limping on March 2, 1976, and when he was stopped by the police officers, he told them that he had injured his foot.

*For the State on rebuttal*

*Jan Stachura, Oak Park Police Officer*

When he arrested defendant on March 2, 1976, defendant never told him that he had a sore toe. He observed defendant walk from his car to the squad car, and walk approximately 50 feet at the police station. Defendant walked in a normal fashion, without a limp.

OPINION

■■■ Defendant first contends that he was denied the right to present a defense. He argues that this happened when he was not allowed to walk before the jury in order to display his scar, and to demonstrate the way in which he allegedly limped at the time of the occurrence. Defendant correctly points out that he has the right to present a defense. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) However, the trial judge has a wide degree of discretion in ruling upon the admissibility of courtroom demonstrations, and the exercise of such discretion will not be interfered with unless there has been an abuse to the prejudice of the accused. (*People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 356 N.E.2d 891.) In evaluating the exercise of such discretion, emphasis is placed on whether the demonstration would be probative of the facts in issue and conducted under substantially similar conditions and circumstances as those which surrounded the original transaction or occurrence. (*People v. Carbona* (1975), 27 Ill. App. 3d 988, 237 N.E.2d 546, *cert. denied* (1976), 424 U.S. 914, 47 L. Ed. 2d 319, 96 S. Ct. 1114.) Defendant testified that he injured his toe in February of 1976, and that he limped when he was arrested on March 2, 1976. That assertion was specifically contradicted and brought into issue by Police Officer Stachura, who observed defendant walking and said that he did not limp. A question of fact and credibility was therefore raised, and resolution of this question was clearly the jury's function. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) Defendant does not assert that he still suffered from his prior injury at his trial in December of 1977, and we cannot agree that refusing his request "to demonstrate the way he limped" for the jury, almost two years after the incident, was prejudicial. In light of the passage of time and the changed circumstances, the court's order does not appear to have been an abuse of discretion. Similarly, defendant testified at trial that he had a scar in the middle of his forehead. Josephine Lenardi, the robbery victim and eyewitness, testified that she did not notice any scars on defendant's face. Whatever questions of credibility this would raise could be resolved by the jury, who were able to view defendant in open court. We see little merit in defendant's contention that it was erroneous for the court to

prevent him from parading before the jury and pointing out his scar. This is especially true in light of the fact that where, as here, the identification of the accused is positive, precise accuracy in describing facial characteristics is unnecessary. (*People v. Jackson* (1974), 23 Ill. App. 3d 945, 320 N.E.2d 591.) Further, the failure to mention or notice the presence of a scar does not create a reasonable doubt as to guilt. (See *People v. Miller* (1964), 30 Ill. 2d 110, 195 N.E.2d 694.) We conclude that the trial court did not abuse its discretion by denying defendant permission to demonstrate a limp or make a special showing of his scar to the jury.

■■■ Defendant also argues that error was committed when the court ruled irrelevant and inadmissible the testimony of Dr. Pio Yanong as to the effect of defendant's toe injury, and of Raymond Lange as to defendant's employment and earnings at International Harvester. Again, although defendant has the right to present a defense, it is within the trial court's power and discretion to exclude evidence on the basis of irrelevancy without infringing on that right. (*People v. Dalzotto* (1977), 55 Ill. App. 3d 995, 371 N.E.2d 859.) Defendant's argument that Raymond Lange's testimony is somehow relevant to the charge against him is totally without merit. Defendant's employment and earnings at International Harvester were not in issue at the trial below, and they would not in any way have prevented him from committing the crime charged. Defendant maintains that Dr. Yanong's testimony would have cast doubt upon Josephine Lenardi's assertion that defendant ran from the store after committing the robbery. An examination of the proposed testimony refutes this assertion. In an offer of proof outside the jury's presence, after responding to questions by the defense attorney regarding defendant's physical condition, Dr. Yanong was questioned by the Assistant State's Attorney as follows:

"Q. Doctor, your testimony, then, is that the patient would be able to run but it would be extremely painful?
A. Sure.

\* \* \*

The Court: May I ask one more question? What is your opinion as to his condition as being ambulatory on March 2nd?
The Witness: He will have some difficulty in ambulation.
The Court: But he could move?
The Witness: He could move. There is no question about that."

Evidence is relevant when it tends to prove a disputed fact or render a matter in issue more or less probable, and the determination of relevancy of possible defense evidence is a matter for the sound discretion of the

trial court. (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.) In light of the doctor's statement that defendant surely could both "run" and "move," it appears that the court did not abuse its discretion in ruling the doctor's testimony irrelevant and inadmissible. Further, we note that the only relevancy the doctor's testimony could possibly have had was to refute Lenardi's testimony that defendant "ran" from the store. In light of the minor nature of this point and the overwhelming evidence adduced against defendant, any possible error involved must be considered harmless.

■■■ Defendant next contends that two remarks made during the prosecutor's closing argument denied him a fair trial. The remarks are the Assistant State's Attorney's statement that "I can't see the scar on his [defendant's] forehead, but we'll take his word for it," and a reference to a "plume" on defendant's hat which may have concealed his scar. Although defendant now argues that this reference was "improper" because there had been no testimony that defendant's hat had a plume, the record shows that no objection, motion to strike or other motions to instruct the jury were made when the statement was uttered at trial. Any allegation of error involving that statement is therefore waived. (*Village of Park Forest v. Walker* (1976), 64 Ill. 2d 286, 356 N.E.2d 42; *People v. Utinans* (1977), 55 Ill. App. 3d 306, 370 N.E.2d 1080.) Regarding the first statement, defendant argues that by saying "I can't see the scar" on defendant's face, the Assistant State's Attorney was improperly giving an opinion. As the State points out, however, a defendant cannot claim he has been prejudiced when the prosecutor's comments are invited responses to comments defense counsel previously made to the jury. (*People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382.) Before the allegedly improper remark quoted above was made, defense counsel emphasized that some members of the jury saw defendant's scar, and characterized its existence as "uncontradicted." The Assistant State's Attorney's statement could therefore be considered a proper response to the defense argument. Moreover, improper remarks do not constitute reversible error unless they result in substantial prejudice to the accused. (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 378 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) Even if the Assistant State's Attorney's remarks regarding a "plume" on defendant's hat or his scar were improper, in light of the overwhelming evidence adduced against defendant, it is clear that the remarks were not so prejudicial as to deny defendant a fair trial or "so flagrant as to threaten deterioration of the judicial process." (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 326.) Accordingly, reversal of defendant's conviction is not warranted.

■■■■ Finally, defendant contends that his sentence of 6 to 18 years was improperly imposed. Among the remarks made by the court at the sentencing hearing was "the thing that disturbs the court is the fact that the defendant was implausible and so improbable that no jury could find anything but guilty." Defendant argues that this amounted to a finding that he committed perjury. He asserts that the court considered his "perjury" in imposing sentence and, because he had not been tried and convicted of perjury, consideration of it was improper. (See *People v. Cowherd* (1978), 63 Ill. App. 3d 229, 380 N.E.2d 21.) This argument is wholly speculative and based upon an argumentative reading of the record. The record shows that the remark quoted above was made in the context of a general overview of the trial, the evidence presented, and the contrasts in the State and defense testimonies. Taken in context, the quoted remark seems to be a mere comment on the support for the jury's verdict. It does not equal a statement by the court that defendant committed the criminal act of perjury, and the court did not state that this was the basis for defendant's sentence. Further, defendant overlooks the fact that among the many factors a court may consider when exercising its discretion and imposing sentence is the defendant's credibility, demeanor, and general moral character. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The sentence of 6 to 18 years was clearly not excessive in light of the serious nature of the offense involved. (See *People v. Townsend* (1976), 40 Ill. App. 3d 88, 351 N.E.2d 290.) Accordingly, it does not appear that defendant's sentence was improperly imposed or was an abuse of the court's discretion.

Based on the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.