THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAWRENCE TRAVIS (Impleaded), Defendant-Appellant.

First District (4th Division)    No. 79-1141

Opinion filed March 26, 1981.

James J. Doherty, Public Defender, of Chicago (Clifford G. Kosoff and Timothy O'Neill, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Joel A. Stein, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:
Defendant, Lawrence Travis, was convicted of murder (Ill. Rev.

Stat. 1975, ch. 38, par. 9—1(a)(1)) in a jury trial and was sentenced to serve a minimum of 100 and a maximum of 200 years' imprisonment. From that judgment and sentence, defendant appeals and we affirm.

The issues presented for review are (1) whether defendant was denied a fair trial because of the prejudice to the jury which resulted when the prosecution twice disregarded the trial judge's ruling and asserted to a witness that defendant had shown the witness a handgun a few days before the decedent was found shot; (2) whether the trial judge committed reversible error when he refused to give Illinois Pattern Jury Instructions, Criminal, No. 3.17 (1968) (hereinafter IPI) with respect to the testimony of Millicent Walker when there was more than sufficient evidence to create probable cause to believe Walker was an accomplice; and (3) whether the trial judge committed reversible error when he refused to give instruction on concealment of a homicidal death when the evidence so warranted.

The evidence and testimony disclosed that on Wednesday, July 20, 1977, at approximately 11 p.m., Frank Lee, a 17-year-old, was home when Billy Poole and defendant came to visit Frank's sister, Dale Lee. In his testimony, Frank stated that he was introduced to defendant, and, after learning that he was unemployed, defendant asked the witness to work with him the next day. The following morning, he and defendant, who was driving a white hearse belonging to the G. W. O'Bee Funeral Home, went to pick up a body which was then transported to the O'Bee Funeral Home, located at 51st Street and Indiana Avenue, in Chicago. The witness stated that he did not go into the funeral home because defendant informed him that Mr. O'Bee, the owner, would become angry. The witness stated he then left defendant and went home.

Millicent Walker testified that on Friday, July 22, 1977, at 11 p.m., she and her girl friend, Diane Brooks, went to visit defendant at the O'Bee Funeral Home. She had first met defendant about 3 weeks previously in a drugstore at 51st and Wentworth. According to the witness, defendant later told her that Mr. O'Bee loved him like a son; that if something happened to O'Bee, defendant would inherit everything, including the funeral home, provided defendant was married. Defendant asked her to marry him and they discussed the idea. The witness stated she had visited defendant at the funeral home on four occasions. When she and Diane arrived there on July 22, defendant led them into the lobby. Defendant indicated he had found a car for her. They went downstairs to defendant's bedroom where there were two beds, a dresser, a television set, and a telephone. Diane had a headache and fell asleep on one of the beds.

Further testifying, the witness said defendant asserted to her that he was authorized to take care of office paperwork, since O'Bee had suffered a stroke and could not sign checks for himself. Defendant then

instructed her to write out two checks, one for the car he had found for her, and the other for $200 which, he stated, was a loan to Dale Lee. She prepared the checks, signed Mr. O'Bee's name as drawer, gave the checks to defendant and never saw them again. The witness stated that while writing the checks she told defendant that, since she did not have any furniture, she would rather have a less expensive car and buy some furniture. Defendant told her that she could have everything because O'Bee "would come up missing." She replied that she did not want to "hear anything about somebody coming up missing * * *." While she and Diane were still in his bedroom, defendant placed a telephone call and asked to speak with Mr. "M" After a brief pause, defendant stated he would call back and hung up the telephone.

In further testimony, Millicent stated that around midnight she, Diane and defendant went up to the lobby of the funeral home where defendant received a telephone call. Defendant conversed with the party, calling him "Mike," and indicated to the caller that she, the witness, had agreed to write out the checks and "Everything's set up for in the morning." After defendant completed his telephone conversation, he told her he would call her at 8 the next morning and they would purchase the car and the furniture. The witness stated she then went home and slept until 11 a.m. Upon awakening, she called defendant who stated that "something had come up" and he would come by for her later. That afternoon, between 3 and 3:30, defendant arrived at her apartment. He brought with him a checkbook and a check-writing machine. They issued four checks: one for $178 and some cents, payable to defendant; one for either $1000 or $1100; one for $40; and one in an amount she could not remember. She stated she signed the name, George W. O'Bee, Jr., as drawer on all four of the checks.

The witness went on to testify that she, her baby, defendant, and Diane then drove in a green Cadillac, which defendant said belonged to him, to a currency exchange. Defendant was unable to cash the $178 check at that currency exchange or at the next one they visited. Thereafter, they proceeded to Nelson Brothers, a furniture store located at 2750 West Grand Avenue. The witness stated that on the way to the furniture store defendant remarked that O'Bee had planned to go to Jamaica; that he called O'Bee that morning, but it sounded as though someone had slapped the telephone out of O'Bee's hand. Also, defendant said (referring to O'Bee) that the "m____ f____ was going to come up missing."

Jay Wigoda, a salesman for Nelson Brothers furniture store, testified that Millicent and defendant purchased a color television set and stand, end tables, lamps, a washing machine, and a dryer. Defendant offered him a check for $1,150 as payment for the purchases. Defendant had indicated to the witness that the check was a wedding present to him from

O'Bee. The witness said he refused to accept the check because of an apparent discrepancy in the amounts shown on the face of the check. Defendant next offered to pay for the purchases with a Bankamericard bearing the name, G. W. O'Bee, Jr.; this, too, was refused due to the mutilated condition of the credit card. According to the witness, defendant then handed him a check in the amount of $156, which was made payable to defendant and which he endorsed over, as a down payment on the purchase price. This check was accepted by the witness and defendant was given a receipt for the purchases.

In additional testimony, Millicent stated that after leaving the furniture store she, her baby, Diane and the defendant drove to a gasoline station at 103rd and Halsted Street. Defendant purchased gas with a Standard Oil credit card bearing the name, G. W. O'Bee, Jr. Thereafter, they drove to the home of Diane's boy friend at 116th and Yale. From there, they drove back toward the O'Bee funeral home, making one stop at a drugstore. The witness stated that before defendant went into the drugstore he gave her $20, placed the Standard Oil credit card in the glove compartment of the car, and took the $40 check with him. She further testified that defendant asked her whether she would go with him to Indiana that night to drop off a package. She answered that she could not accompany him because she had not arranged for a babysitter. According to the witness, defendant told her she could keep the Cadillac so long as she did not drive it over to the funeral home. At 9 p.m., she returned to the funeral home and rang the doorbell, but no one answered.

Frank Lee testified that at 9 that same evening defendant came to his home and offered him $10 if he would accompany the defendant to the airport. After obtaining his mother's permission, the witness left for the airport with defendant in a black Cadillac. Defendant drove to the Dan Ryan Expressway and headed in a southerly direction. The witness stated he slept during the drive and until the car stopped. Upon awakening, he looked around and realized they were in the country. Defendant instructed him to stay in the car. At that point, defendant turned the car lights off, got out of the car and walked to the trunk compartment. The witness stated he saw defendant open the trunk door and that defendant "throwed out a body." Defendant closed the trunk door and got back into the car, remarking to the witness that his leg and hand were hurting. When the witness asked defendant what was the noise he heard, defendant told him to "shut up and forget about it." Thereafter, defendant drove the witness home where he had a conversation with his mother and then went to bed.

Earnese Lee, the mother of Frank and Dale, testified that after defendant brought her son home she talked briefly with Frank and returned to the living room. There, she saw and heard defendant talking

to himself; he was saying, "I killed a man; I killed a man." The witness asked defendant who was the man, but defendant did not reply.

Cornelia Redding, a girl friend of George O'Bee, testified that she had spoken with O'Bee early on Saturday, July 23, 1977. She called him later, at 5 p.m., but received no response. Thereafter, she called continually until 3 Sunday morning, July 24. The witness stated she never reached Mr. O'Bee.

Millicent, in continued testimony, stated that defendant called her at 8 on Sunday morning, July 24. He told her "something had come up" and he would talk with her later. Sometime after 5 p.m., defendant called her again and said he was in Joliet; that he had been arrested, but the matter would be cleared up. The witness stated that while she was talking with Sergeant Bennett on the telephone, the police came to her house. She gave them the checkwriting machine, the checkbook, and the car keys to the green Cadillac.

Richard C. Alexander, a part-time police officer for the village of Monee, testified that he responded to a radio message to go to Monee-Manhattan Road immediately west of the I-57 interchange. Upon arrival, Officer Alexander parked his car and walked down the road. There, on the left side of the road, he saw the body of a black male lying in a ditch. The victim was wearing a white T-shirt and blue pants. The body wounds indicated that the man had been shot. On the ground north of the body was a coat with a wallet protruding from the pocket. The wallet contained identification of George O'Bee.

Mandel Durrah, O'Bee's nephew, testified that after receiving a telephone call from Redding at 11:30 on Sunday morning, July 24, he immediately went to the funeral home. He was unable to enter and called the police. After the police arrived, they checked O'Bee's house to see whether he was there. The witness stated he then returned to the funeral home where defendant arrived sometime later. They entered the funeral home. Thereafter, the witness stated, he received a telephone call from the Will County sheriff's office. Defendant then drove him to Will County in a black Cadillac. The witness further testified that when they arrived at the Will County sheriff's office he talked with two policemen. Defendant gave one of the officers the keys to the black Cadillac. When one of the officers left, defendant asked the witness whether he thought the police were going to look in the trunk compartment of the car. The witness stated he assured defendant that the police only wanted a routine look at the car. Defendant repeated the question. When the policeman re-entered the room, both officers requested the witness to leave the room.

Sergeant John Watters testified that he searched the black Cadillac. The sergeant stated he noticed a substance, which appeared to be blood, just on the lip of the inside of the trunk compartment of the car, and the

floor mat and rug inside the trunk were wet. He returned to the police station and talked on the telephone with Investigator Laverty of the Chicago Police Department. Thereafter, he had a brief conversation with Investigator Pederson. Sergeant Watters further testified that he, again, interviewed defendant. Investigator Pederson was present and informed defendant of his *Miranda* rights. The sergeant asked defendant to place all items in his possession on the desk. Defendant placed various personal items on the desk, including a black leather case resembling a badge case. Inside the case was a silver star and three credit cards issued to G. W. O'Bee, Jr., among which were Standard Oil and Bankamericard. Defendant also had in his possession a leather key ring holding miscellaneous keys. Defendant was then transported to the Area One Chicago Police Department.

Sergeant Watters, in his testimony, stated he continued his investigation by interviewing Millicent, Dale Lee, Frank Lee, and Rufus Kidd. On Monday, July 25, at 4:30 a.m., he talked with defendant. *Miranda* rights were, again, explained to defendant. The witness advised defendant that he believed defendant was responsible for the death of George O'Bee. Defendant then stated he was going to tell the whole story and related to Sergeant Watters that on Wednesday, July 20, Ike Lee and Michael Martin, also known as "Jojo," were at the funeral home. Ike and Michael were armed with hand guns and suggested to defendant that he lure O'Bee to the funeral home so that they could kill him. Defendant said he declined to help, whereupon, Ike and Michael warned they would kill defendant if within a couple of days he had not made up his mind to cooperate with them.

Further testifying, Sergeant Watters stated defendant told him that his next encounter with Michael and Ike was Saturday, July 23, at approximately 2 p.m., when they forced their way into the office of the funeral home. Michael, who had a .45-caliber hand gun, assaulted defendant with it, placing the gun to defendant's head, and proceeded to take defendant to his room located in the basement. Defendant and Michael had a conversation and defendant went to the office area of the funeral home where he attempted to place a call to the police department. Prior to defendant's completion of the call, Ike came upstairs. After defendant hung up the telephone and re-entered the foyer, Ike discharged his weapon at defendant, striking the front door of the funeral home. At that point, Michael came up from the basement and also discharged his gun, striking the ceiling of the foyer. Thereafter, O'Bee approached the foyer from the rear of the funeral home. Michael fired one shot, hitting O'Bee in the groin; they then took O'Bee down to defendant's room where Michael fired four more shots into O'Bee's body. While defendant exited via the garage door at the rear of the building, Michael and Ike ransacked the funeral home.

According to Sergeant Watters' testimony, defendant stated to him that after fleeing the funeral home he proceeded to the home of his aunt and uncle. Defendant left there and went to Millicent's apartment where he asked her to forge some checks because he needed money in order to leave Chicago. Defendant then returned to the funeral home at 7:15 p.m. and noticed that O'Bee's body was gone. Thereafter, he walked to the garage area where he touched the hood of the black Cadillac and found it to be warm. The witness stated that defendant contended Michael and Ike allowed him to leave the funeral home because they knew he had called the police; that if he went to the police, Michael and Ike would tell the police that they were hired by defendant to kill O'Bee, for which they would each receive $5000, so that he (defendant) could inherit the funeral home and all of O'Bee's money. The sergeant also stated that defendant further said he would not be surprised if Michael and Ike told the police that Ike's brother, Frank, was with defendant at the time defendant allegedly threw the body out of the car trunk.

At the conclusion of the conversation with defendant, Sergeant Watters testified that he went to the O'Bee funeral home. There were no signs of forced entry and there were no bullet holes in the front door or in the ceiling of the foyer. He went to defendant's room where he observed two beds, a dresser, a television set, and a portable radio sitting on the floor. A shotgun and rifle were lying on the bed. On July 25, 1977, the sergeant charged defendant with the murder of O'Bee.

After all the evidence was presented, the defense requested that the jury be given two instructions. One instruction was on the elements of the offense of concealment of a homicidal death. The court indicated that if concealment of a homicidal death was a lesser-included offense, and, if a charge was pending on this offense, then the instruction would be given. The defense's second instruction request went to the question of accomplice testimony. The court also denied the giving of the jury instruction on accomplice testimony (IPI Criminal No. 3.17). The court stated that an accomplice would be a person who had been involved in the crime for which the accused stands charged.

Defendant first contends the prosecution committed reversible error when it twice disregarded the trial judge's ruling and asserted to a witness that the defendant had shown the witness a hand gun a few days before the victim was shot. Furthermore, defendant asserts that the improper introduction of this highly incompetent evidence severely prejudiced the jury and contributed to their verdict finding defendant guilty.

The following cross-examination by the prosecution on redirect reflects the allegedly prejudicial evidence improperly admitted:

"Q. [Prosecutor]: I believe you told us that on that third time you were in the room that Lawrence Travis used, is that correct?

A. [Walker]: Yes.

Q. [Prosecutor]: In that room didn't Lawrence Travis show you a hand gun he had?

Mr. Kling [defense attorney]: Objection.

Mr. Acker [defense attorney]: Objection.

The Court: Sustained.

Mr. Acker: Ask the State's Attorney be admonished.

[Prosecutor]: Your Honor, Counsel had gone into what happened in that room.

The Court: The jury will be directed to disregard that question. And the question will be stricken and any response thereto will be stricken. That's beyond the scope of cross, Counsel."

■■ ■ The determination of relevancy is in the sound discretion of the court. Evidence is relevant when it tends to prove a disputed fact or renders a matter in issue more or less probable. (*People v. Stokes* (1979), 75 Ill. App. 3d 813, 819, 394 N.E.2d 681, 686.) Where evidence is relevant and otherwise admissible, it is not to be excluded simply because it may have a tendency to prejudice the accused. (*People v. Zenner* (1979), 78 Ill. App. 3d 40, 54, 396 N.E.2d 1107, 1118.) Where it appears that improper remarks of counsel did not constitute a material factor in the defendant's conviction, the verdict will not be disturbed. (*People v. Berry* (1960), 18 Ill. 2d 453, 458, 165 N.E.2d 257, 259.) Furthermore, when the evidence of the defendant's guilt was completely persuasive and the improper remarks did not constitute a material factor in the conviction, the verdict of guilt will not be disturbed. (*People v. Fields* (1974), 59 Ill. 2d 516, 522, 322 N.E.2d 33, 36.) The evidence showed that the murder took place in defendant's bedroom; that a shotgun, a rifle, and .45-caliber bullet fragments and cartridge casings were found in the defendant's room; and that defendant had the decedent's car and credit cards. Blood stains were also found in the trunk compartment of the car which defendant drove to the police station. The evidence, within the context of the other surrounding circumstances, was persuasive enough to support a guilty verdict.

■■ Generally, cases hold it is improper to ask a question which suggests an answer without being prepared to offer evidence of what was suggested by the question. But, the prompt sustaining of the objection to the question cured and rendered harmless the error. (*People v. Belvedere* (1979), 72 Ill. App. 3d 998, 1014, 390 N.E.2d 1239, 1250.) In the instant case, the objection was sustained and the jury was instructed to disregard it, and the subject matter was not raised again.

The defense maintains that *People v. Curry* (1975), 25 Ill. App. 3d 637, 323 N.E.2d 778, and *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402, are applicable to the instant case. But, in *Curry*, closing remarks made by the prosecutor were held to be improper where the

prosecutor assumed facts which were not satisfactorily accounted for during cross-examination of the occurrence witness and not grounded in other competent evidence. While in *Hovanec* the prosecutor made objectionable remarks and commented that the defense was trying to hide something, neither of the above occurred in the case at bar. Further, *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, also cited by the defense, held that it was improper to ask questions which suggest answers that have no basis of support in the record. In the instant case, the prosecutor was eliciting an answer to a question which was, in fact, supported by the evidence.

For the above reasons, we disagree with the defense's position that reversible error occurred. If any error occurred, it was rendered harmless after the trial court sustained the objection to the question and admonished the jury to disregard the question.

The defendant's second contention is that the trial judge committed reversible error in refusing to give IPI Criminal No. 3.17, the accomplice instruction, with respect to the testimony of Millicent Walker. Defendant asserts that the evidence was sufficient to create probable cause to believe Millicent was defendant's accomplice in the murder of O'Bee. Defendant maintains that Millicent's forgery of O'Bee's checks and possession of decedent's car keys, check-writing machine, and checkbook created sufficient probable cause to believe that she was guilty of the victim's murder as either a principal, accessory, or on the theory of accountability.

■■ The accepted test of whether a witness is an accomplice is whether he, himself, could have been indicted for the offense either as principal or accessory. (See *People v. Robinson* (1974), 59 Ill. 2d 184, 319 N.E.2d 772; *People v. Hrdlicka* (1931), 344 Ill. 211, 176 N.E. 308.) If the witness could not be indicted for the offense, then he is not an accomplice. An accomplice must knowingly, voluntarily, and with common interest unite with the principal offender in the commission of the crime. 21 Am. Jur. 2d *Criminal Law* §118 (1965).

■■ If a witness is not an accomplice under the accepted test, it is not error to refuse to give a tendered instruction relative to the testimony of an accomplice. (*People v. Nowak* (1970), 45 Ill. 2d 158, 168-69, 258 N.E.2d 313, 318-19.) The accomplice instruction was properly refused, since there was no evidence that Millicent knowingly, voluntarily, and with common intent united with defendant in the murder of O'Bee.

In all of the circumstances of this case, we find nothing in the record to remotely indicate that any substantial right of defendant was in any manner affected. We hold that the trial judge's refusal to give the accomplice instruction with respect to the testimony of Millicent was not reversible error, since she could not have been indicted for the murder of O'Bee either as a principal or an accessory.

■■ Defendant's final contention is that the trial court erred when it did not give defendant's submitted instruction on concealment of a homicidal death, since there was sufficient evidence at trial to support a finding of guilt of that offense.

It is the contemplation of the law that the jury be instructed only concerning the crime of which defendant stands charged. (*People v. Hamilton* (1929), 336 Ill. 294, 296, 168 N.E.2d 325, 326.) In *People v. Edge* (1950), 406 Ill. 490, 494-95, 94 N.E.2d 359, 362, the court said:

> "A judgment of conviction entered upon an information which does not charge an offense is not merely erroneous, but void for want of jurisdiction of the subject matter, and may be attacked at any time, either in a direct proceeding on review or collaterally. [Citations.] * * * '* * * To give a court jurisdiction of the subject matter in a criminal case it is essential that the accused be charged with a crime. If that is not done, a plea of guilty in manner and form as charged does not authorize the court to render a judgment of conviction for some criminal offense, and if a judgment is so rendered it is void and may be attacked collaterally.' "

Inasmuch as defendant was not charged with concealment of a homicidal death, the trial court did not have the authority to so charge, and concealment is not a lesser-included offense of the charge of murder.

In our system, when the prosecutor has probable cause to believe that the accused committed an offense defined by statute, it is within his discretion to decide whether or not to prosecute and what charge to file or bring before a grand jury. (See *People v. Ruiz* (1979), 78 Ill. App. 3d 326, 396 N.E.2d 1314.) The court in *People v. Baron* (1970), 130 Ill. App. 2d 588, 591, 264 N.E.2d 423, 426, stated:

> "The State's Attorney's office is a part of the executive branch of the government, and the powers exercised by that office are executive powers. A judge or court cannot exercise the powers of the executive branch of our government."

The trial judge does not possess the power to give instructions on a crime for which defendant was not charged.

Illinois law charges the State's Attorney with commencement and prosecution of criminal cases. (Ill. Rev. Stat. 1975, ch. 14, par. 5(1).) It is also the State's Attorney's responsibility, as representative of the People, to evaluate the evidence and determine what offense can properly be charged. If the trial court attempts to make this determination, the order would be void. Likewise, in the absence of an accusation charging defendant with an offense, no waiver or consent by defendant can confer jurisdiction or authorize a valid conviction. Therefore, the trial court did not err in denying defendant's instruction on concealment of a homicidal death.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI, P. J., and LINN, J., concur.